Matthew E. Beck
Jenny Chung Quraishi
Jeanelly Nuñez
**CHIESA SHAHINIAN & GIANTOMASI PC**
105 Eisenhower Parkway
Roseland, New Jersey 07068
Tel.: (973) 325-1500
mbeck@csglaw.com
jquraishi@csglaw.com
jnunez@csglaw.com

*Attorneys for Plaintiffs Pharmacosmos Holding*
*A/S, Pharmacosmos A/S, and Pharmacosmos*
*Therapeutics, Inc.*

Of Counsel:

Jeffrey J. Oelke
Ryan P. Johnson
Vanessa Park-Thompson
**FENWICK & WEST LLP**
902 Broadway, 18th Floor
New York, NY  10010-6035
(212) 430-2600
Email: joelke@fenwick.com
ryan.johnson@fenwick.com
vpark-thompson@fenwick.com

Jonathan G. Tamimi
**FENWICK & WEST LLP**
401 Union St., 5th Floor
Seattle, WA 98101
(206) 913-4325
jtamimi@fenwick.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHARMACOSMOS HOLDING A/S, PHARMACOSMOS A/S, and PHARMACOSMOS THERAPEUTICS INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MYLAN LABORATORIES LTD.<br><br>Defendant. | **Civil Action No. 26-CV-4946**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY JUDGMENT AND PATENT INFRINGEMENT**

Plaintiffs Pharmacosmos Holding A/S, Pharmacosmos A/S, and Pharmacosmos Therapeutics Inc. (collectively, "Pharmacosmos"), for their Complaint against Defendant Mylan Laboratories Ltd. ("Mylan"), hereby allege as follows:

**NATURE OF THE ACTION**

1.      This is an action for patent infringement under the patent laws of the United States, Title 35 of the United States Code, and for a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.  This action arises from Mylan's submission to the U.S. Food and Drug Administration ("FDA") of Abbreviated New Drug Application ("ANDA") No. 212572 for approval to market a generic version of Injectafer (ferric carboxymaltose injection), and from Mylan's concrete steps toward the commercial manufacture, importation, offer for sale, and sale of its generic product (the "ANDA Product") in the United States, through which Mylan will actively and knowingly induce infringement of the claims of United States Patent Nos. 12,295,934 (the "'934 patent") and 12,303,486 (the "'486 patent") (collectively, the "Asserted Patents").

**THE PARTIES**

2.      Plaintiff Pharmacosmos Holding A/S is a corporation organized and existing under the laws of the Kingdom of Denmark, with a principal place of business at Roervangsvej 30, DK-4300 Road, Holbæk, Denmark.

3.      Plaintiff Pharmacosmos A/S is a corporation organized and existing under the laws of the Kingdom of Denmark, with a principal place of business at Roervangsvej 30, DK-4300 Road, Holbæk, Denmark.  Pharmacosmos A/S is a wholly owned subsidiary of Pharmacosmos Holding A/S.

4.      Plaintiff Pharmacosmos Therapeutics Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 120 Headquarters Plaza, East Tower, 6th Floor, Morristown, New Jersey 07960.  Pharmacosmos Therapeutics Inc. is a wholly owned subsidiary of Pharmacosmos A/S.

5.      Pharmacosmos Holding A/S is the owner of all right, title, and interest in each Asserted Patent.  Pharmacosmos A/S holds an exclusive world-wide license to the rights to the Asserted Patents, including in the United States and in the State of New Jersey in particular. Pharmacosmos A/S exclusively sublicenses to Pharmacosmos Therapeutics Inc. its rights to the Asserted Patents in the United States, including in the State of New Jersey.

6.      Pharmacosmos A/S also licenses from Pharmacosmos Holding A/S the rights to Pharmacosmos's ferric derisomaltose product, sold in the United States under the brand name Monoferric, in the State of New Jersey and throughout the United States.  Monoferric is an iron carbohydrate complex injection for the treatment for iron deficiency anemia that competes directly with Injectafer (ferric carboxymaltose injection).  Pharmacosmos Therapeutics Inc. sublicenses from Pharmacosmos A/S the rights to Monoferric throughout the United States, including in the State of New Jersey.

7.      Pharmacosmos is an innovative Danish pharmaceutical company focused on developing new therapies for iron deficiency anemia. Around 2010, Pharmacosmos introduced a new iron carbohydrate complex—a nanoparticle consisting of an iron core coated by a carbohydrate shell—called ferric derisomaltose (also known as iron isomaltoside 1000). It proved to be a groundbreaking anemia therapy; it was the first high-dose injectable iron approved in the United States that safely replenishes most anemic patients' iron in a single infusion, avoiding multiple disruptive and costly visits to medical facilities required by other iron deficiency drugs. Pharmacosmos sells ferric derisomaltose in the United States under the trade name Monoferric.

8.      On information and belief, Defendant Mylan is a company organized and existing under the laws of India, with a principal place of business at Plot No. 564/A/22, Road No. 92, Jubilee Hills 500034, Hyderabad, India.

3

9.      On information and belief, Mylan is a generic pharmaceutical company that develops and manufactures generic pharmaceutical products that are marketed and sold throughout the United States. *See Vifor (International) AG and American Regent, Inc. v. Mylan Laboratories Ltd.*, CA No. 19-cv-13955, Dkt. No. 60 at 3 (D.N.J. June 8, 2020). One of those generic pharmaceutical products is Mylan's ANDA Product. *See id*. at 24.

## **JURISDICTION AND VENUE**

10.     Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1-9 of this Complaint.

11.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq.*, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     On information and belief, this Court has personal jurisdiction over Mylan, under the New Jersey state long arm statute and consistent with due process of law, because it regularly does or solicits business in New Jersey, engages in other persistent courses of conduct in New Jersey, and/or derives substantial revenue from services or things used or consumed in New Jersey, demonstrating that Mylan has systematic and continuous contacts with this judicial district.

13.     On information and belief, Mylan has purposefully conducted and continues to conduct business in this judicial district by manufacturing, importing, marketing, and distributing pharmaceutical products, including generic drug products, either by itself or through its parent corporation, subsidiaries and/or affiliates, throughout the United States, including in this judicial district.

14.     On information and belief, Mylan is subject to personal jurisdiction in this judicial district through its pursuit of regulatory approval for the commercial manufacture, use, and/or sale

4

of Mylan's ANDA Product in this judicial district and to residents of this judicial district. Through at least these activities, Mylan has purposely availed itself of the rights and benefits of New Jersey law such that it should reasonably anticipate being sued in this judicial district.

15.     On information and belief, Mylan has been, and continues to be, the sole party responsible for the drafting, submission, request for approval, and maintenance of ANDA No. 212572. On information and belief, Mylan sent a "Notice of Paragraph IV Certification" dated May 7, 2019 to the NDA holder pursuant to § 505(j)(2)(B)(ii) of the Federal Food, Drug, and Cosmetic Act and § 314.95 of the Code of Federal Regulations identifying "Mylan Laboratories Ltd." as the entity that submitted ANDA No. 212572 to the FDA. *See Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020).  On further information and belief, the letter stated that Mylan submitted ANDA No. 212572 seeking to engage in the commercial manufacture, use, and/or sale of Mylan's ANDA Product prior to the expiration of the patents asserted in that case.  *See id*. at 10.

16.     On information and belief, when ANDA No. 212572 is approved, Mylan will import, market, distribute, offer for sale, and/or sell Mylan's ANDA Product, either by itself or through its parent corporation, subsidiaries, affiliates, and/or licensees (collectively, "related entities"), in the United States, including in New Jersey, and alone or with its related entities will derive substantial revenue from the use or consumption of Mylan's ANDA Product in the State of New Jersey.

17.     On information and belief, when the FDA approves ANDA No. 212572, Mylan's ANDA Product will be marketed, distributed, offered for sale, and/or sold in New Jersey; prescribed by physicians practicing in New Jersey; administered by healthcare professionals located within New Jersey; and/or used by patients in New Jersey, all of which will have a substantial effect on New Jersey.

18.     By virtue of its patent rights in the Asserted Patents covering methods of using Injectafer (and its active ingredient ferric carboxymaltose), Pharmacosmos will be harmed by the marketing, distribution, offer for sale, and/or sale of Mylan's ANDA Product, including in New Jersey.  On information and belief, Mylan's ANDA Product, a generic version of Injectafer, will include prescribing information that is substantially the same as the prescribing information in the current Injectafer label, which instructs physicians to administer Injectafer in a manner that infringes the Asserted Patents, as described in detail below.  *See infra* ¶¶ 51-109.  Mylan will thus harm Pharmacosmos by inducing physicians to administer and/or use Mylan's ANDA Product to infringe Pharmacosmos's patent rights.  Mylan will also cause harm to Pharmacosmos by using Pharmacosmos's patents without permission.  Further, Mylan's ANDA Product will compete with Monoferric, thus the sale or offer to sell Mylan's ANDA Product in the United States will directly and adversely affect the sales of Plaintiffs' products, including Monoferric, both in the United States and in other countries, and cause economic damage to Plaintiffs, including lost profits and reduction in market share.

19.     Mylan has availed itself of the jurisdiction of this Court previously, for example, by filing counterclaims in *Vifor*, Dkt. Nos. 16, 60 (D.N.J. July 26, 2019 and June 5, 2020). Moreover, Mylan's counterclaims in that case concerned the same ANDA Product at issue in the present case.  *Id*., Dkt. No. 60 at 22-29.

20.     Additionally, this Court has personal jurisdiction over Mylan pursuant to Fed. R. Civ. P. 4(k)(2), to the extent it is not subject to personal jurisdiction in the courts of any state, because Mylan is a foreign entity, Pharmacosmos's claims arise under federal patent law, and the exercise of jurisdiction satisfies due process requirements, at least because, upon information and belief, Mylan has systematic and continuous contacts throughout the United States by

manufacturing, importing, marketing, and/or distributing pharmaceutical products, including generic drug products, either by itself or through its related entities.

21.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b) for at least the reason that Mylan is a foreign corporation not residing in any United States district and may be sued in any judicial district that has personal jurisdiction, including this judicial district.

22.     On information and belief, Mylan intends to, subject to FDA approval, begin marketing, distributing, offering for sale, selling, and instructing physicians to use its ANDA Product as soon as July 1, 2026. On information and belief, under the terms of its settlement agreement with Vifor and American Regent, those companies granted Mylan licenses to market Mylan's ANDA Product in the United States beginning July 1, 2026. On information and belief, Mylan is preparing to "be first to market" with a generic Injectafer (ferric carboxymaltose injection) product. *See* https://investor.viatris.com/static-files/12929a11-f8f0-4790-b88b-63ffa820d9b6 (Mylan's parent company stating that that "we are working on many other programs, including the potential to be first to market for our generics of … Injectafer® ….").

## BACKGROUND TO THE PATENTS-IN-SUIT

23.     Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1-22 of this Complaint.

24.     The Asserted Patents cover methods of reducing the risk and severity of FGF23-mediated side effects and hypophosphatemia associated with administering ferric carboxymaltose to treat iron deficiency and iron deficiency anemia.  FGF23 (or fibroblast growth factor 23) is a hormone that regulates phosphate and vitamin D homeostasis.   '934 patent, 3:4-6. Hypophosphatemia is a condition characterized by low serum phosphate levels.  *Id*., 7:64-8:11. Depending on its severity, hypophosphatemia can lead to diverse and life-threatening medical

complications, including reduced muscle function and conditions related to loss of bone density such as osteomalacia, osteopenia, and osteoporosis. *See, e.g.*, J. Kaur and D. Castro, *Hypophosphatemia*, *in* StatPearls (2024), available at https://www.ncbi.nlm.nih.gov/books/NBK493172/ (last visited May 1, 2026).

25. The Asserted Patents have a priority date of October 29, 2018, based on priority claims to European Patent Application No. 18203223.5, filed on that date.

26. Before the priority date of the Asserted Patents, the scientific consensus in the field was that, to the extent that ferric carboxymaltose was associated with hypophosphatemia, it was transient, asymptomatic, and/or clinically irrelevant. *See, e.g.*, '934 patent, 2:26-47. Consistent with that view, and prior to the Asserted Patents' priority date, the product labeling for Injectafer merely listed hypophosphatemia as one of several potential side effects (in addition to nausea, hypertension, flushing, and dizziness) and did not provide any hypophosphatemia-specific warnings. *See* Injectafer Label at 1, Revised July 2013, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/203565s000lbl.pdf (last visited May 1, 2026); *see also* Ferinject Summary of Product Characteristics, Revised March 2017, available at https://web.archive.org/web/20180324223902/https://www.medicines.org.uk/emc/product/5910/smpc#UNDESIRABLE_EFFECTS (last visited May 1, 2026).

27. It was not until after Pharmacosmos conducted clinical trials comparing the safety of ferric carboxymaltose to iron isomaltoside 1000 (the active ingredient in Pharmacosmos' Monoferric product) that the true risks and complexities of ferric carboxymaltose-induced hypophosphatemia were discovered. The results of these trials (the "Phosphare trials"), which are in the Asserted Patents, provided the first statistically significant evidence that ferric

carboxymaltose frequently causes severe hypophosphatemia. *See* '934 patent, 29:25-29, Figs. 1-5 (reporting that "[t]he rate of severe hypophosphatemia was significantly higher" following administration of ferric carboxymaltose than that of iron isomaltoside 1000. Notably, the Phosphare trials revealed that ferric carboxymaltose is associated not only with a marked initial increase in intact FGF23 ("iFGF23") after the initial dose, but with a subsequent two- to three-fold higher increase in iFGF23 following a further dose. '934 patent, 3:19-26, 29:30-36, Figs 6, 7. This surprising and previously unknown auto-synergistic effect was of particular clinical significance because many patients require a further dose of ferric carboxymaltose to replenish their iron stores. Moreover, the Phosphare trials revealed that "treatment with [ferric carboxymaltose] according to current practice leads to direct clinical consequences such as reduced muscle functions and increased bone turnover," two complications caused by hypophosphatemia. '934 patent, 3:19-26, 29:46-62, Figs. 14, 15; *see also, e.g.*, Kaur & Castro.

28.    Through this research, Pharmacosmos developed novel and inventive methods of reducing the risk and severity of FGF23-mediated side effects like low serum phosphate and hypophosphatemia when treating iron deficiency and iron deficiency anemia with ferric carboxymaltose, as disclosed and claimed in the Asserted Patents.

29.    Additionally, and as a result of, *inter alia*, the Phosphare trials and the inventions of the Asserted Patents, the medical community came to appreciate the frequency and severity of FGF23-mediated side effects associated with ferric carboxymaltose, including hypophosphatemia. On information and belief, based on the significant risk of severe hypophosphatemia and FGF23-mediated side effects as disclosed in the Asserted Patents, the FDA required revisions to Injectafer's label to include specific warnings for hypophosphatemia.

9

30.     In particular, and after the Asserted Patents' October 29, 2018, priority date, the Injectafer label was revised in February 2020 to warn healthcare professionals that "[s]ymptomatic hypophosphatemia requiring clinical intervention has been reported in patients at risk of low serum phosphate in the postmarketing setting" and that such cases "have occurred mostly after repeated exposure to Injectafer in patients with no history of renal impairment." The February 2020 Injectafer label identified a number of hypophosphatemia risk factors and directed healthcare professionals to "monitor serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment." *See* Injectafer label, Revised February 2020, § 5.2, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/203565s009lbl.pdf (last visited May 1, 2026) (including a "recent major change" of warnings and precautions for symptomatic hypophosphatemia).

31.     In May 2023, the Injectafer label was again revised to provide further warnings that symptomatic hypophosphatemia "with serious outcomes including osteomalacia and fractures requiring clinical intervention" had been reported "mostly after repeated exposure to Injectafer in patients with no reported history of renal impairment." *See* Injectafer Label, § 5.2, Revised May 31, 2023 (Supplement 24), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/203565s024lbl.pdf (last visited May 1, 2026) (the "2023 Injectafer Label"). The 2023 Injectafer Label instructed healthcare professionals to "[c]orrect pre-existing hypophosphatemia prior to initiating therapy with Injectafer" by "monitor[ing]… patients at risk for chronic low serum phosphate." *Id*. The 2023 Injectafer Label also instructed healthcare professionals to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who

receives a second course of therapy within three months" and to "[t]reat hypophosphatemia as medically indicated." *Id*.

32.    The Injectafer Label was most recently revised in January 2025.  *See* Injectafer Label, Revised January 3, 2025 (the "2025 Injectafer Label").  A copy of the 2025 Injectafer Label is attached to this complaint as Exhibit C.  In addition to the warnings in the 2023 Injectafer Label directing healthcare professionals to check for, monitor, and treat hypophosphatemia prior to administering ferric carboxymaltose, the current Injectafer label identifies hereditary hemorrhagic telangiectasia as an additional hypophosphatemia risk factor.  *Id*., § 5.2.

**THE PATENTS-IN-SUIT**

33.    The Asserted Patents provide improved therapeutic methods for treating iron deficiency and/or iron deficiency anemia by administering ferric carboxymaltose according to defined regimens and/or to selected subgroups of subjects, to minimize the severity and frequency of FGF23-mediated side effects, including hypophosphatemia.  The claims of each Asserted Patent recite different aspects of the novel therapeutic methods disclosed in their shared specification.  Those inventions are discussed in more detail below.

**A.    The '934 Patent**

34.    On May 13, 2025, the USPTO issued the '934 patent, entitled "Treating Iron Deficiency with Ferric Carboxymaltose."  A true and correct copy of the '934 patent is attached to this Complaint as Exhibit A.  The inventors of the '934 patent are Tobias Sidelmann Christensen, Philip Schaffalitzky de Muckadell, Lars Lykke Thomsen, and Claes Christian Strøm. The inventors assigned the '934 patent to Pharmacosmos Holding A/S, which is the owner of all right, title, and interest in the '934 patent.

11

35.     The inventions claimed in the '934 patent provide concrete solutions to the issue of side effects associated with ferric carboxymaltose-induced hypophosphatemia.  In particular, the claims recite specific methods of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency by administering a specific compound at specific doses to a specific patient population to achieve a specific outcome.

36.     For example, claim 1 and its dependent claims recite specific methods of administering ferric carboxymaltose at specific doses and specific dosing regimens, to only those subjects who are in need of a further ferric carboxymaltose dose, and only after testing the subject's serum phosphate levels and then correcting any hypophosphatemia, as disclosed in the '934 patent. *See, e.g.*, '934 patent, 11:36-60, 12:10-43, 13:60-14:34, 15:31-39, 16:21-36.  Claim 1 and its dependent claims achieve the specific outcome of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose, as disclosed in the '934 patent. *See, e.g.*, '934 patent, 12:35-43, 13:60-14:34, 15:31-39.  These novel methods build on the inventors' discovery that repeat dosing of ferric carboxymaltose exacerbates FGF23-mediated side effects and hypophosphatemia, by requiring the evaluation of subjects after a dose of ferric carboxymaltose, and providing a further dose only after testing indicates that the subject has normal serum phosphate levels—or, if the subject does not have normal serum phosphate levels, the subject's hypophosphatemia is corrected prior to the further dose, thereby reducing the severity of any side effects associated with hypophosphatemia. The measurement of serum phosphate levels and treatment of any hypophosphatemia prior to administration of a further dose of ferric carboxymaltose was novel, nonobvious, and not the conventional approach in the field, given the general consensus that any hypophosphatemia potentially caused by ferric carboxymaltose was transient and asymptomatic, and not a factor that

healthcare professionals needed to consider as part of their decisions as to whether to administer a further dose of the drug.

37.     As another example, claim 31 and its dependent claims recite specific methods of administering ferric carboxymaltose at specific doses and specific dosing regimens, to only those subjects who are in need of a further ferric carboxymaltose dose, and only after correcting any hypophosphatemia and then testing the subject's serum phosphate levels, as disclosed in the '934 patent. *See, e.g.*, '934 patent, 11:36-60, 12:10-43, 13:60-14:34, 15:31-39, 16:21-36. Claim 31 and its dependent claims achieve the specific outcome of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose, as disclosed in the '934 patent. *See, e.g.*, '934 patent, 6:44-48, 12:35-43, 13:60-14:34, 15:31-39.  The treatment of hypophosphatemia and measurement of serum phosphate levels prior to administration of a further dose of ferric carboxymaltose was novel, nonobvious, and not the conventional approach in the field, given the general consensus that any hypophosphatemia potentially caused by ferric carboxymaltose was transient and asymptomatic, and not a factor that healthcare professionals needed to consider as part of their decisions as to whether to administer a further dose of the drug.

38.     Prior to the '934 patent's inventions, the severity of side effects associated with hypophosphatemia in connection with the administration of ferric carboxymaltose, and the frequency of those side effects, were unknown in the art.  Nor was it known that the increases in iFGF23 are auto-synergistically compounded by a further dose of ferric carboxymaltose, as described in the '934 patent. '934 patent, 3:19-26, 29:30-45.  And it was not known that healthcare professionals administering a further dose of ferric carboxymaltose should test for and treat hypophosphatemia prior to administering a further dose in order to reduce the severity of

hypophosphatemia-related side effects and safely treat patients with ferric carboxymaltose. In other words, both the problems addressed by the '934 patent and their solutions were unknown. By reciting testing for hypophosphatemia and treating it prior to the administration of a further ferric carboxymaltose dose, the '934 patent provides an inventive solution to avoid causing or exacerbating the severity of a patient's hypophosphatemia symptoms that could otherwise occur with repeated ferric carboxymaltose treatment.

### B.    The '486 Patent

39.    On May 20, 2025, the USPTO issued the '486 patent, entitled "Treating Iron Deficiency with Ferric Carboxymaltose." A true and correct copy of the '486 patent is attached to this Complaint as Exhibit B. The inventors of the '486 patent are Tobias Sidelmann Christensen, Philip Schaffalitzky De Muckadell, Lars Lykke Thomsen, and Claes Christian Strøm. The inventors assigned the '486 patent to Pharmacosmos Holding A/S, which is the owner of all right, title, and interest in the '486 patent.

40.    The inventions claimed in the '486 patent provide concrete solutions to the issue of symptomatic hypophosphatemia associated with the administration of ferric carboxymaltose. In particular, the claims recite specific methods of reducing risk of symptomatic hypophosphatemia associated with repeated treatment of iron deficiency by administering a specific compound at specific doses to a specific patient population to achieve a specific outcome.

41.    For example, claim 1 and its dependent claims recite specific methods of administering ferric carboxymaltose at specific doses and specific dosing regimens, to only those subjects who are in need of a further ferric carboxymaltose dose and only after testing the subject's serum phosphate levels and correcting any hypophosphatemia, as disclosed in the '486 patent. *See, e.g.*, '486 patent, 11:36-60, 12:10-43, 13:60-14:34, 15:31-39, 16:21-36. Claim 1 and its

14

dependent claims achieve the specific outcome of reducing the risk of symptomatic hypophosphatemia associated with repeated treatments of iron deficiency with ferric carboxymaltose. *See, e.g.*, '486 patent, 6:44-48, 12:35-43, 13:60-14:34, 15:31-39. These novel methods build on the inventors' discovery that repeat dosing of ferric carboxymaltose exacerbates FGF23-mediated side effects and hypophosphatemia, by requiring the evaluation of subjects after a dose of ferric carboxymaltose and providing a further dose only after testing indicates that the subject has normal serum phosphate levels—or, if the subject does not have normal serum phosphate levels, the subject's hypophosphatemia is corrected prior to the further dose, thereby reducing the risk of any side effects associated with hypophosphatemia. The measurement of serum phosphate levels and treatment of hypophosphatemia prior to administration of a further dose of ferric carboxymaltose was novel, nonobvious, and not the conventional approach in the field, given the general consensus that any hypophosphatemia potentially caused by ferric carboxymaltose was transient and asymptomatic, and not a factor that healthcare professionals needed to consider as part of their decisions as to whether to administer a further dose of the drug.

42.     Prior to the '486 patent's inventions, it was not known that ferric carboxymaltose frequently causes clinically significant, symptomatic hypophosphatemia. Nor was it known at that time that the increases in iFGF23 are auto-synergistically compounded by a further dose of ferric carboxymaltose, as described in the '486 patent. '486 patent, 3:19-26, 29:42-56. And it was not known then that healthcare professionals administering a further dose of treatment should test for and treat hypophosphatemia prior to administering a further dose of ferric carboxymaltose in order to reduce the risk of symptomatic hypophosphatemia and safely treat patients with ferric carboxymaltose. In other words, both the problems addressed by the '486 patent and their solutions were unknown. By reciting testing for hypophosphatemia and treating it prior to the

15

administration of a further ferric carboxymaltose dose, the '486 patent provides an inventive solution to reduce the risk of hypophosphatemia associated with repeated ferric carboxymaltose treatment.

## MYLAN'S ANDA AND PLANS TO MARKET GENERIC INJECTAFER

43.    Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1-42 of this Complaint.

44.    As noted above, Mylan filed ANDA No. 212572 seeking FDA approval for a generic version of Injectafer (ferric carboxymaltose) on or before May 7, 2019.  *Vifor*, Dkt. No. 60 at 9 (D.N.J. June 8, 2020). Shortly thereafter, American Regent and Vifor (International) AG sued Mylan for patent infringement, alleging that the sale and/or use of Mylan's ANDA Product would infringe various patents owned by American Regent and/or Vifor.  *Id.*, Dkt. No. 1 (D.N.J. June 18, 2019). The parties eventually settled their dispute, with Mylan receiving a license to launch its ANDA Product on July 1, 2026.  *See id*., Dkt. No. 246 (D.N.J. Dec. 15, 2021) (stipulating American Regent's dismissal of claims against Mylan); *see also* December 20, 2021 Press Release, *Vifor Pharma and American Regent announce settlement of Injectafer® patent litigation*, available at:        https://newsroom.csl.com/2021-12-20-Vifor-Pharma-and-American-Regent-announce-settlement-of-Injectafer-R-patent-litigation (last visited May 1, 2026).   On information and belief, Mylan intends to obtain final FDA approval and begin marketing its ANDA Product on July 1, 2026 or soon thereafter.

45.    Mylan's ANDA No. 212572 takes advantage of an expedited pathway to obtaining FDA approval to sell a prescription medication in the United States.  *See* 21 U.S.C. § 355(a), (j). Choosing the ANDA pathway allows generic pharmaceutical companies to avoid the burden and expense of clinical studies needed to prove that their drugs are safe and effective—normally a

16

prerequisite for FDA approval. *See id*., § 355(b)(A)(i). Instead, the ANDA applicant can rely on a prior pharmaceutical company's clinical studies as proof of safety and efficacy—but only if the ANDA product is essentially the same as a previously approved product. *See generally id*. § 355(j)(2(A)(i)-(v) (specifying the manner in which a generic product under an ANDA must be the same as a previously approved product).

46.     One of the ways in which an ANDA product must be the same as a previously approved product is its "labeling"—the information provided with the product that, among other things, specifies how the product should be used to treat patients. *Id*., § 355(j)(2)(v). FDA regulations make clear that, as a general rule, an ANDA product's labeling must be essentially identical to that of the previously approved product upon which the ANDA relies, apart from certain ministerial changes—for example, changes reflecting the different manufacturers of the two products. *See* 21 C.F.R. § 314.94(a)(8)). Consequently, by statute and by FDA regulations, Mylan's labeling for the generic product that is the subject of Mylan's ANDA No. 212572 (hereinafter referred to as "Mylan's Label") must be materially the same as the labeling for Injectafer. *Id*.; 21 U.S.C. § 355(j)(2(A)(v).

47.     As noted above, Injectafer's label has changed several times since Mylan first filed its ANDA on or before May 7, 2019. *See supra* ¶¶ 29-32. FDA "recommends that ANDA holders and applicants submit revised ANDA labeling at the earliest time possible" and make such labeling revisions "in a timely fashion" following changes to the label of the product on which the ANDA relies. *See* FDA, Revising ANDA Labeling Following Revision of the RLD Labeling, Guidance for Industry 3-4 (2024), available at https://www.fda.gov/media/175654/download (last visited May 1, 2026). Additionally, FDA requires ANDA applicants to make any amendments required to make their ANDAs ready for approval at least three months before their desired launch date.

17

*See* FDA, ANDA Submissions – Amendments to Abbreviated New Drug Applications Under GDUFA, Guidance for Industry 13 (2024), available at https://www.fda.gov/media/89258/download (last visited May 1, 2026). In this case, the three-month deadline for amendments prior to Mylan's July 1, 2026 licensed launch date was April 1, 2026. Accordingly, on information and belief, Mylan has amended the proposed labeling for its ANDA Product to conform to the current labeling for Injectafer (or will do so before it receives FDA approval and begins selling its ANDA Product). As explained below, such labeling will induce infringement of Pharmacosmos's '934 and '486 patents. See *infra* ¶¶ 51-109.

48.     On March 11, 2026, Pharmacosmos sent Mylan a letter (the "Notice Letter") informing it that the use of Mylan's ANDA Product would infringe the claims of the '934 and '486 patents and asking Mylan to confirm whether it planned to market its product prior to the patents' expiry. Pharmacosmos also asked Mylan to confirm whether Mylan's Label would be identical to Injectafer's, and if not, to provide a copy of the proposed label and explain any differences. *Id*. A copy of the Pharmacosmos Notice Letter is attached to this Complaint as Exhibit D.

49.     On April 9, 2026, Mylan sent a response to the Notice Letter through its outside counsel, acknowledging receipt of the Notice Letter. Mylan's response asserted that neither Mylan's ANDA nor the use of its ANDA Product infringe the Asserted Patents and that the Asserted Patents are invalid. Mylan did *not* deny that it plans to launch Mylan's ANDA Product imminently upon FDA approval of Mylan's ANDA, nor did it deny that Mylan's Label is materially the same as the 2025 Injectafer Label, despite Pharmacosmos's explicit requests to provide such information. Mylan also declined to provide a copy of the proposed label for Mylan's ANDA Product. A copy of Mylan's April 9, 2026 letter is attached to this Complaint as Exhibit E.

50.    Consequently, on information and belief, Mylan intends to begin marketing its ANDA Product on its licensed launch date of July 1, 2026 or soon thereafter, despite its knowledge of the Asserted Patents and its knowledge or willful blindness that it has and will continue to infringe Pharmacosmos's patents.  Further, pursuant to federal statute and FDA guidelines, Mylan's ANDA Product will include labeling that is substantially identical to the 2025 Injectafer Label (the current Injectafer label), which belies Mylan's claim that the use of Mylan's ANDA Product will not infringe the Asserted Patents, as explained in detail below.  Thus, with knowledge of the Asserted Patents, Mylan will induce infringement of the Asserted Patents by instructing healthcare professionals to administer Mylan's ANDA Product according to the label for Mylan's ANDA.  Accordingly, Mylan will actively encourage healthcare professionals to practice the claimed methods of the Asserted Patents.

## COUNT I: DECLARATORY JUDGMENT OF INFRINGEMENT OF
## U.S. PATENT NO. 12,295,934 UNDER 35 U.S.C § 271(b)

51.    Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1-50 of this Complaint.

52.    On information and belief, upon FDA approval of Mylan's ANDA Product and its commercial launch, Mylan will infringe the '934 patent, under 35 U.S.C. § 271(b), by actively and knowingly inducing healthcare providers to infringe one or more claims of the '934 patent, including claims 1–60.

53.    On information and belief, Mylan has had knowledge of the '934 patent at least since March 20, 2026, when Mylan received Pharmacosmos's Notice Letter advising Mylan that marketing and selling its ANDA Product according to the current Injectafer label will induce infringement of the '934 patent.

19

54.     On information and belief, based on federal statutes and FDA regulations, including 21 U.S.C. § 355(j)(2)(v) and 21 C.F.R. § 314.94, Mylan's ANDA Product will have materially the same labeling as the 2025 Injectafer Label, and Mylan will supply its ANDA Product to healthcare providers along with that labeling or labeling materially identical thereto.

55.     Healthcare providers that administer Mylan's ANDA Product in accordance with the instructions in Mylan's Label will directly infringe one or more claims of the '934 patent under 35 U.S.C. § 271(a), including exemplary claims 1 and 31, either literally or under the doctrine of equivalents.

56.     Exemplary claim 1 of the '934 patent recites:

A method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose to a subject in need thereof, said method comprising,

administering a dose of ferric carboxymaltose to said subject;

determining that said subject needs a further dose of ferric carboxymaltose;

prior to administering the further dose of ferric carboxymaltose, measuring said subject's serum phosphate levels, and if said subject has hypophosphatemia, treating the hypophosphatemia as medically indicated prior to administering the further dose of ferric carboxymaltose; and

administering the further dose of ferric carboxymaltose to said subject.

57.     As recited above, claim 1 requires "[a] method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose." Administering Mylan's ANDA Product according to the indications listed in Mylan's Label, which, on information and belief, will track the 2025 Injectafer Label, will constitute a "repeated treatment of iron deficiency with ferric carboxymaltose." *See* 2025 Injectafer Label, §§ 2.3 ("Injectafer treatment may be repeated if IDA or iron deficiency in heart failure reoccurs"), 5.2 ("[c]heck serum phosphate levels prior to a repeat course of treatment in

20

patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months"). Mylan's ANDA Product is a generic version of Injectafer and therefore has the same active ingredient as Injectafer, namely, ferric carboxymaltose. *See* 2025 Injectafer Label, Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020) (stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug). On information and belief, Mylan's Label will state that Mylan's ANDA Product is indicated as a method of treating iron deficiency anemia in 1) adult and pediatric patients 1 year of age and older who have either intolerance or an unsatisfactory response to oral iron; and 2) adult patients who have non-dialysis dependent chronic kidney disease. *See* 2025 Injectafer Label, § 1. On information and belief, Mylan's Label will further state that Mylan's ANDA Product is indicated for the treatment of iron deficiency in adult patients with heart failure and New York Heart Association class II/III to improve exercise capacity. *Id.* On information and belief, Mylan's Label will instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs." *Id.*, § 2.3. On information and belief, Mylan's Label will also instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses." *Id.*, Highlights of Prescribing Information.

58. Mylan's Label will instruct healthcare providers to reduce their patients' side effects associated with hypophosphatemia in connection with repeated treatment with ferric carboxymaltose. For example, and on information and belief, Mylan's Label will warn that

21

"[s]ymptomatic hypophosphatemia with serious outcomes including osteomalacia and fractures requiring clinical intervention has been reported in patients treated with ferric carboxymaltose in the post-marketing setting" and that "[t]hese cases have occurred mostly after repeated exposure to ferric carboxymaltose in patients with no reported history of renal impairment." *See id*., § 5.2. On information and belief, Mylan's Label will also instruct physicians to "[c]orrect pre-existing hypophosphatemia prior to initiating therapy with ferric carboxymaltose." *Id*. Similarly, on information and belief, Mylan's Label will instruct physicians to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months" and to "[t]reat hypophosphatemia as medically indicated." *Id*. By correcting or treating hypophosphatemia in accordance with Mylan's Label, healthcare providers will perform "[a] method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose."

59. Claim 1 requires "administering a dose of ferric carboxymaltose to said subject." The active ingredient of Mylan's ANDA Product is ferric carboxymaltose. *See id*., Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020) (stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug). On information and belief, the recommended dosage listed on Mylan's Label for treating iron deficiency anemia in patients weighing 50 kg or more will be "ferric carboxymaltose 750 mg intravenously in two doses separated by at least 7 days." *See* 2025 Injectafer Label, Highlights of

Prescribing Information.  On information and belief, Mylan's Label will also direct that "[f]or adult patients weighing 50 kg or more, an alternative dose of ferric carboxymaltose 15 mg/kg body weight up to a maximum of 1,000 mg intravenously may be administered as a single-dose per course." *Id*.  Thus, physicians who administer Mylan's ANDA Product according to the instructions provided in Mylan's Label will do so by "administering a dose of ferric carboxymaltose to said subject."

60.    Claim 1 further requires "determining that said subject needs a further dose of ferric carboxymaltose."  On information and belief, Mylan's Label will instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses[.]" *See id*., Highlights of Prescribing Information.  On information and belief, Mylan's Label will further instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs." *Id*.  On information and belief, Mylan's Label will also instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months[,]" meeting this claim limitation. *Id*., § 2.3.  Physicians following any of these instructions will determine that at least some patients require a further dose of treatment.  Thus, healthcare providers who administer Mylan's ANDA Product in accordance with Mylan's Label will infringe this limitation.

61.    Claim 1 requires "prior to administering the further dose of ferric carboxymaltose, measuring said subject's serum phosphate levels."  On information and belief, Mylan's Label will instruct healthcare providers to "[m]onitor serum phosphate levels in patients at risk for chronic low serum phosphate" and to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of

therapy within three months," and thus such providers will perform steps meeting this claim limitation. *See id.*, § 5.2.

62.     Claim 1 requires that after measuring the subject's serum phosphate levels, "if said subject has hypophosphatemia, treating the hypophosphatemia as medically indicated prior to administering the further dose of ferric carboxymaltose." On information and belief, Mylan's label will instruct physicians to "[m]onitor serum phosphate levels in patients at risk for chronic low serum phosphate" and to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months." *See id.*, § 5.2. On information and belief, Mylan's Label will further instruct physicians to "[t]reat hypophosphatemia as medically indicated." *Id.* Thus, healthcare providers following these instructions will determine whether a patient has hypophosphatemia and, if so, will treat it as medically indicated prior to administering a further dose of Mylan's ANDA Product.

63.     Claim 1 requires "administering the further dose of ferric carboxymaltose to said subject." On information and belief, Mylan's Label will instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses," which, when performed, will meet this claim limitation. *See id.*, Highlights of Prescribing Information. On information and belief, Mylan's Label will also instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs," which meets this claim limitation as well. *Id.* On information and belief, Mylan's Label will further instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months." *Id.*, § 2.3. Physicians who administer a "repeat

course of treatment" will do so by administering a further dose of ferric carboxymaltose to the subject, as recited in this limitation.

64.     Accordingly, healthcare providers following the instructions in Mylan's Label will directly infringe claim 1 of the '934 patent.

65.     Claims 2-30 of the '934 patent depend directly or indirectly from claim 1 and recite additional limitations that will also be met by physicians who administer Mylan's ANDA Product in accordance with Mylan's Label.  By actively encouraging and instructing physicians to administer Mylan's ANDA Product in a manner that directly infringes claims 2-30, with knowledge of the patent and its infringement, Mylan will induce infringement of those claims.

66.     Exemplary claim 31 of the '934 patent recites:

> A method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose to a subject in need thereof, said method comprising,
>
> administering a dose of ferric carboxymaltose to said subject;
>
> determining that said subject needs a further dose of ferric carboxymaltose;
>
> prior to administering the further dose of ferric carboxymaltose, first treating said subject with a medically indicated treatment for hypophosphatemia, then measuring said subject's serum phosphate levels; and
>
> administering the further dose of ferric carboxymaltose to said subject.

67.     As recited above, claim 31 requires "[a] method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose."  Administering Mylan's ANDA Product according to the indications listed in Mylan's Label will constitute a "repeated treatment of iron deficiency with ferric carboxymaltose."   The active ingredient of Mylan's ANDA Product is ferric carboxymaltose. *See* 2025 Injectafer Label, Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June

8, 2020) (stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug). On information and belief, Mylan's Label will state that Mylan's ANDA Product is indicated as a method of treating iron deficiency anemia in 1) adult and pediatric patients 1 year of age and older who have either intolerance or an unsatisfactory response to oral iron; and 2) adult patients who have non-dialysis dependent chronic kidney disease. *See* 2025 Injectafer Label, § 1. On information and belief, Mylan's Label will further state that Mylan's ANDA Product is indicated for the treatment of iron deficiency in adult patients with heart failure and New York Heart Association class II/III to improve exercise capacity. *Id*. On information and belief, Mylan's Label will instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs." *Id*., § 2.3. On information and belief, Mylan's Label will also instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses . . ." *Id*., Highlights of Prescribing Information.

68. Mylan's Label will instruct healthcare providers to reduce the severity of their patients' hypophosphatemia-related side effects in connection with repeated treatment with ferric carboxymaltose. For example, on information and belief, Mylan's Label will warn that "[s]ymptomatic hypophosphatemia with serious outcomes including osteomalacia and fractures requiring clinical intervention has been reported in patients treated with ferric carboxymaltose in the post-marketing setting" and that "[t]hese cases have occurred mostly after repeated exposure to ferric carboxymaltose in patients with no reported history of renal impairment." *See id*., § 5.2.

26

On information and belief, Mylan's Label will also instruct physicians to "[c]orrect pre-existing hypophosphatemia prior to initiating therapy with ferric carboxymaltose." *Id*. Similarly, on information and belief, Mylan's Label will instruct physicians to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months" and to "[t]reat hypophosphatemia as medically indicated." *Id*. By correcting or treating hypophosphatemia in accordance with Mylan's Label, healthcare providers will perform "[a] method of reducing severity of side effects associated with hypophosphatemia in connection with repeated treatment of iron deficiency with ferric carboxymaltose."

69.    Claim 31 requires "administering a dose of ferric carboxymaltose to said subject." The active ingredient in Mylan's ANDA Product is ferric carboxymaltose. *See id*., Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020) (stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug). On information and belief, the recommended dosage listed on Mylan's Label for treating iron deficiency anemia in patients weighing 50 kg or more will be "ferric carboxymaltose 750 mg intravenously in two doses separated by at least 7 days." *See* 2025 Injectafer Label, Highlights of Prescribing Information. On information and belief, Mylan's Label will also direct that "[f]or adult patients weighing 50 kg or more, an alternative dose of ferric carboxymaltose 15 mg/kg body weight up to a maximum of 1,000 mg intravenously may be administered as a single-dose per course." *Id*. Thus, physicians who administer Mylan's ANDA Product according to the

instructions provided in Mylan's Label will do so by "administering a dose of ferric carboxymaltose to said subject."

70.    Claim 31 further requires "determining that said subject needs a further dose of ferric carboxymaltose."  On information and belief, Mylan's Label will instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses[.]"  *Id*., Highlights of Prescribing Information.  On information and belief, Mylan's Label will further instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs."  *Id*.  On information and belief, Mylan's Label will also instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months." *Id*., § 2.3.  Physicians following any of these instructions will determine that at least some patients require a further dose of treatment.  Thus, healthcare providers who administer Mylan's ANDA Product in accordance with Mylan's Label will infringe this limitation.

71.    Claim 31 requires "prior to administering the further dose of ferric carboxymaltose, first treating said subject with a medically indicated treatment for hypophosphatemia."  On information and belief, Mylan's Label will instruct physicians to "[c]orrect pre-existing hypophosphatemia prior to initiating therapy with ferric carboxymaltose."  *See id*., § 5.2.  On information and belief, Mylan's Label will also instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs," to "[c]heck serum phosphate levels" in patients who need or receive repeat courses of treatment, and to "[t]reat hypophosphatemia as medically indicated."  *Id*., § 2.3.  Thus, healthcare providers who follow

these instructions will determine that at least some patients have hypophosphatemia and treat it with a medically indicated treatment prior to administering a further dose of ferric carboxymaltose.

72.     Claim 31 requires that after treating the subject's hypophosphatemia with a medically indicated treatment, "then measuring the subject's serum phosphate levels." On information and belief, Mylan's Label will instruct healthcare providers to "[m]onitor serum phosphate levels in patients at risk for chronic low serum phosphate" and to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months," and when either or both steps are performed, physicians will meet this claim limitation.  *See id*., § 5.2.

73.     Claim 31 requires "administering the further dose of ferric carboxymaltose to said subject."   On information and belief, Mylan's Label will instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs," which will meet this limitation. *See id*., Highlights of Prescribing Information.  On information and belief, Mylan's Label will also instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses," which will meet this claim limitation as well.  *Id*.  On information and belief, Mylan's Label will further instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months," which, when repeat doses are administered, will also meet this claim limitation. *Id*., § 2.3.

74.     Accordingly, healthcare providers administering Mylan's ANDA Product following the instructions in Mylan's Label will directly infringe claim 31 of the '934 patent.

75. Claims 32-60 of the '934 patent depend directly or indirectly from claim 31 and recite additional limitations that will also be met by physicians who administer Mylan's ANDA Product in accordance with Mylan's Label. By actively encouraging and instructing physicians to administer Mylan's ANDA Product in a manner that directly infringes claims 32-60, with knowledge of the patent and its infringement, Mylan will induce infringement of those claims.

76. Based on Pharmacosmos's Notice Letter, Mylan has had actual knowledge of the '934 patent at least since March 20, 2026, and has known or been willfully blind to the fact that making, using, selling, offering for sale, and/or importing its ANDA Product will induce infringement of the '934 patent.

77. In addition, Mylan has known or should have known that administering Mylan's ANDA Product in accordance with Mylan's Label will induce infringement of the '934 patent since September 22, 2025, the date on which Pharmacosmos filed suit against Injectafer's NDA Holder alleging, *inter alia*, that administration of Injectafer in accordance with the 2025 Injectafer Label induces infringement of the Asserted Patents. *See Pharmacosmos Holding A/S et al. v. Daiichi Sankyo, Inc. et al.*, CA No. 25-cv-15857, Dkt. No. 1 (D.N.J. Sep. 22, 2025). As discussed above, on information and belief, Mylan's Label will be substantially the same as the 2025 Injectafer Label as required by federal statutes and FDA regulations. *See, e.g.*, 21 U.S.C. § 355(j)(2)(v); 21 C.F.R. § 314.94. Thus, based on Pharmacosmos's public allegations that the 2025 Injectafer Label induces infringement of the '934 patent, Mylan has known or should have known that administering its ANDA Product in accordance with Mylan's Label will induce infringement of the '934 patent.

78. In sum, Mylan will induce infringement of the '934 patent by actively encouraging and directing healthcare providers to administer Mylan's ANDA Product to patients in a manner

that infringes one or more claims of the '934 patent, including through the instructions in Mylan's Label and/or other instructions Mylan provides to physicians regarding the administration of Mylan's ANDA Product. Mylan will do so with knowledge of the '934 patent and knowledge or willful blindness that administration in the manner prescribed by its ANDA Product's labeling will constitute infringement of one or more claims of the '934 patent. Further, Mylan will do so with the specific intent that healthcare providers administer Mylan's ANDA Product in a manner that infringes one or more claims of the '934 patent. Thus, Mylan will be liable for induced infringement under 35 U.S.C. § 271(b).

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 12,295,934 UNDER 35 U.S.C. § 271(e)(2)

79. Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1–78 of this Complaint.

80. Under 35 U.S.C. § 271(e)(2)(A), Mylan has infringed at least one claim of the '934 patent, including, for example, claims 1–60, by submitting, or causing to be submitted to the FDA, ANDA No. 212572 seeking approval to manufacture, use, import, offer to sell and/or sell Mylan's ANDA Product before the expiration date of the '934 patent.

81. 35 U.S.C. § 271(e)(2)(A) provides that it is an act of infringement to submit an ANDA for the purpose of obtaining FDA approval to engage in commercial sales of a drug to be used in a manner claimed in a patent prior to the expiration of that patent. As explained above, on information and belief, Mylan has filed an ANDA seeking FDA approval to sell Mylan's ANDA Product, and, subject to FDA approval, intends to launch its ANDA Product on or about July 1, 2026, which is prior to the expiration of the '934 patent. *See supra* ¶¶ 22, 44, 50. Furthermore, on information and belief, Mylan is seeking FDA approval for one or more uses of its ANDA Product that are claimed in the '934 patent, as explained above. *See supra* ¶¶ 51-78. On

31

information and belief, Mylan has knowledge of the '934 patent, at least because of the notice Pharmacosmos provided on March 11, 2026, and which Mylan received on or about March 20, 2026.

82.     On information and belief, if the FDA approves ANDA No. 212572, healthcare professionals will directly infringe under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least one claim of the '934 patent by the use of Mylan's ANDA Product according to Mylan's provided instructions and/or label.

83.     On information and belief, Mylan knows and intends that healthcare professionals will use Mylan's ANDA Product according to Mylan's provided instructions and/or label and knows or is willfully blind that healthcare professionals will do so in an infringing manner. Mylan will therefore induce infringement of one or more claims of the '934 patent with the requisite intent under 35 U.S.C. § 271(b).

84.     Upon information and belief, upon approval, Mylan will take active steps to encourage the use of Mylan's ANDA Product by healthcare professionals with knowledge or willful blindness that it will be used by healthcare professionals in a manner that infringes at least one claim of the '934 patent for the benefit of Mylan. Thus, upon information and belief, Mylan will induce infringement of at least one claim of the '934 patent with the requisite intent under 35 U.S.C. § 271(b).

85.     If Mylan's marketing and sale of Mylan's ANDA Product prior to the expiration of the '934 patent is not enjoined, Pharmacosmos will suffer harm from the unauthorized use of the inventions claimed in the Asserted Patents.

32

## COUNT III: DECLARATORY JUDGMENT OF INFRINGEMENT OF
## U.S. PATENT NO. 12,303,486 UNDER 35 U.S.C § 271(b)

86.    Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1-85 of this Complaint.

87.    On information and belief, upon FDA approval of Mylan's ANDA Product and its commercial launch, Mylan will infringe the '486 patent, under 35 U.S.C. § 271(b), by actively and knowingly inducing healthcare providers to infringe one or more claims of the '486 patent, including claims 1–29.

88.    On information and belief, Mylan has had knowledge of the '486 patent at least since March 20, 2026, when Mylan received Pharmacosmos's Notice Letter advising Mylan that marketing and selling its ANDA Product according to the current Injectafer label will induce infringement of the '486 patent.

89.    On information and belief, based on federal statutes and FDA regulations, including 21 U.S.C. § 355(j)(2)(v) and 21 C.F.R. § 314.94, Mylan's ANDA Product will have the same labeling as the 2025 Injectafer Label, and Mylan will supply its ANDA Product to healthcare providers along with that labeling or labeling materially identical thereto.

90.    Healthcare providers that administer Mylan's ANDA Product in accordance with the instructions in Mylan's Label will directly infringe one or more claims of the '486 patent under 35 U.S.C. § 271(a), including exemplary claim 1, either literally or under the doctrine of equivalents.

91.    Exemplary claim 1 of the '486 patent recites:

A method of reducing risk of symptomatic hypophosphatemia associated with repeated treatment of iron deficiency with ferric carboxymaltose in a subject in need thereof, said method comprising,

administering a dose of ferric carboxymaltose to said subject;

33

determining that said subject needs a further dose of ferric carboxymaltose;

prior to administering the further dose of ferric carboxymaltose, measuring said subject's serum phosphate levels, and if said subject has hypophosphatemia, treating the hypophosphatemia as medically indicated prior to administering the further dose of ferric carboxymaltose; and

administering the further dose of ferric carboxymaltose to said subject.

92.    As recited above, claim 1 requires "[a] method of reducing risk of symptomatic hypophosphatemia associated with repeated treatment of iron deficiency with ferric carboxymaltose."  Administering Mylan's ANDA Product according to the indications listed in Mylan's Label, which, on information and belief, will track the 2025 Injectafer Label, will constitute a "repeated treatment of iron deficiency with ferric carboxymaltose."  The active ingredient in Mylan's ANDA Product is ferric carboxymaltose.  *See* 2025 Injectafer Label, Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020) (stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug).  On information and belief, Mylan's Label will state that Mylan's ANDA Product is indicated as a method of treating iron deficiency anemia in 1) adult and pediatric patients 1 year of age and older who have either intolerance or an unsatisfactory response to oral iron; and 2) adult patients who have non-dialysis dependent chronic kidney disease.  *See* 2025 Injectafer Label, § 1.  On information and belief, Mylan's Label will further state that Mylan's ANDA Product is indicated for the treatment of iron deficiency in adult patients with heart failure and New York Heart Association class II/III to improve exercise capacity.  *Id*.   On information and belief,

Mylan's Label will instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs." *Id.*, § 2.3. On information and belief, Mylan's Label will also instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses." *Id.*, Highlights of Prescribing Information.

93.     Mylan's Label will instruct healthcare providers to reduce the risks of symptomatic hypophosphatemia associated with repeated administration of ferric carboxymaltose. For example, on information and belief, Mylan's Label will warn that "[s]ymptomatic hypophosphatemia with serious outcomes including osteomalacia and fractures requiring clinical intervention has been reported in patients treated with ferric carboxymaltose in the post-marketing setting" and that "[t]hese cases have occurred mostly after repeated exposure to ferric carboxymaltose in patients with no reported history of renal impairment." *See id.*, § 5.2. On information and belief, Mylan's Label will also instruct physicians to "[c]orrect pre-existing hypophosphatemia prior to initiating therapy with ferric carboxymaltose." *Id.* Similarly, on information and belief, Mylan's Label will instruct physicians to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months" and to "[t]reat hypophosphatemia as medically indicated." *Id.* Thus, healthcare providers that correct or treat hypophosphatemia in accordance with the instructions and warnings in Mylan's Label will perform "[a] method of reducing risk of symptomatic hypophosphatemia associated with repeated treatment of iron deficiency with ferric carboxymaltose."

94.     Claim 1 requires "administering a dose of ferric carboxymaltose to said subject." The active ingredient in Mylan's ANDA Product is ferric carboxymaltose. *See* 2025 Injectafer

Label, Highlights of Prescribing Information; *Vifor*, Dkt. No. 60 at 24 (D.N.J. June 8, 2020)(stating that "[Mylan] submitted ANDA No. 212572 to FDA seeking approval for its ferric carboxymaltose injection product"); *see also* 21 C.F.R. § 314.94(a)(5)(i)(A) (requiring that for single-active-ingredient drug products such as Injectafer, ANDA applicants must submit a statement confirming that the active ingredient of their proposed drug product is the same as that of the reference listed drug).  On information and belief, the recommended dosage listed on Mylan's Label for treating iron deficiency anemia in patients weighing 50 kg or more will be "ferric carboxymaltose 750 mg intravenously in two doses separated by at least 7 days."  *See* 2025 Injectafer Label, § 2.1.   On information and belief, Mylan's Label will also direct that "[f]or adult patients weighing 50 kg or more, an alternative dose of ferric carboxymaltose 15 mg/kg body weight up to a maximum of 1,000 mg intravenously may be administered as a single-dose per course." *Id.*   Thus, physicians who administer Mylan's ANDA Product according to the instructions in Mylan's Label will do so by "administering a dose of ferric carboxymaltose to said subject."

95.    Claim 1 further requires "determining that said subject needs a further dose of ferric carboxymaltose."  On information and belief, Mylan's Label will instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses."  *See id*., Highlights of Prescribing Information.  On information and belief, Mylan's Label will further instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs."  *Id*., § 2.3.  On information and belief, Mylan's Label will also instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months." *Id*.  Physicians following any or

36

all of these instructions will determine that at least some patients require a further dose of Mylan's ANDA Product.

96.    Claim 1 requires "prior to administering the further dose of ferric carboxymaltose, measuring said subject's serum phosphate levels."  On information and belief, Mylan's Label will instruct healthcare providers to "[m]onitor serum phosphate levels in patients at risk for chronic low serum phosphate" and to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months," which, when performed, will meet this claim limitation. *See id*., § 5.2.

97.    Claim 1 requires that after measuring the subject's serum phosphate levels, "if said subject has hypophosphatemia, treating the hypophosphatemia as medically indicated prior to administering the further dose of ferric carboxymaltose."  On information and belief, Mylan's Label will instruct physicians to "[m]onitor serum phosphate levels in patients at risk for chronic low serum phosphate" and to "[c]heck serum phosphate levels prior to a repeat course of treatment in patients at risk for low serum phosphate and in any patient who receives a second course of therapy within three months." *See id*., § 5.2.  On information and belief, Mylan's Label will further instruct physicians to "[t]reat hypophosphatemia as medically indicated." *Id*.  Thus, healthcare providers who administer Mylan's ANDA Product in accordance with Mylan's Label will determine that some patients have hypophosphatemia and treat it as medically indicated prior to administering a further dose.

98.    Claim 1 requires "administering the further dose of ferric carboxymaltose to said subject."  On information and belief, Mylan's Label will instruct physicians that "ferric carboxymaltose treatment may be repeated if IDA or iron deficiency in heart failure reoccurs."

*See id.*, Highlights of Prescribing Information.  On information and belief, Mylan's Label will also instruct physicians that "[f]or patients weighing 50 kg or more, the recommended dosage is ferric carboxymaltose 750 mg intravenously in two doses." *Id.*  On information and belief, Mylan's Label will further instruct healthcare providers to "[c]heck serum phosphate levels in patients at risk for low serum phosphate who require a repeat course of treatment or for any patient who receives a repeat course of treatment within three months." *Id.*, § 2.3.  Thus, healthcare providers who administer Mylan's ANDA Product in accordance with Mylan's Label will administer a further dose of ferric carboxymaltose.

99.     Accordingly, healthcare providers following the instructions in Mylan's Label will directly infringe one or more claims of the '486 patent.

100.     Claims 2-29 of the '486 patent depend directly or indirectly from claim 1 and recite additional limitations that will also be met by physicians who administer Mylan's ANDA Product in accordance with Mylan's Label.  By actively encouraging and instructing physicians to administer Mylan's ANDA Product in a manner that directly infringes claims 2-29, with knowledge of the patent and its infringement, Mylan will induce infringement of those claims.

101.     Based on Pharmacosmos's Notice Letter, Mylan has had actual knowledge of the '486 patent at least since March 20, 2026, and has known or been willfully blind to the fact that making, using, selling, offering for sale, and/or importing its ANDA Product will induce infringement of '486 patent.

102.     In addition, Mylan has known or should have known that administering Mylan's ANDA Product in accordance with Mylan's Label would induce infringement of the '486 patent since September 22, 2025, the date on which Pharmacosmos filed suit against Injectafer's NDA Holder alleging, *inter alia*, that administration of Injectafer in accordance with the 2025 Injectafer

38

Label induces infringement of the Asserted Patents.  *See Pharmacosmos Holding A/S et al. v. Daiichi Sankyo, Inc. et al.*, CA No. 25-cv-15857, Dkt. No. 1 (D.N.J. Sep. 22, 2025).  As discussed above, on information and belief, Mylan's Label will be substantially the same as the 2025 Injectafer Label as required by federal statutes and FDA regulations.  *See, e.g.*, 21 U.S.C. § 355(j)(2)(v); 21 C.F.R. § 314.94.  Thus, based on Pharmacosmos's public allegations that the 2025 Injectafer Label induces infringement of the '486 patent, Mylan has known or should have known that administering its ANDA Product in accordance with Mylan's Label will induce infringement of the '486 patent.

103.    In sum, Mylan will induce infringement of the '486 patent by actively encouraging and directing healthcare providers to administer Mylan's ANDA Product to patients in a manner that infringes one or more claims of the '486 patent, including through the instructions in Mylan's Label and/or other instructions Mylan provides physicians regarding the administration of Mylan's ANDA Product.  Unless enjoined, Mylan will do so with knowledge of the '486 patent and knowledge or willful blindness that administration in the manner prescribed by its product's labeling will constitute infringement of one or more claims of the '486 patent.  Further, Mylan will do so with the specific intent that healthcare providers administer Mylan's ANDA Product in a manner that infringes one or more claims of the '486 patent.  Thus, Mylan will be liable for induced infringement under 35 U.S.C. § 271(b).

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 12,303,486
UNDER 35 U.S.C. § 271(e)(2)**

104.    Pharmacosmos re-alleges and incorporates by reference the allegations in Paragraphs 1–103 of this Complaint.

105.    Under 35 U.S.C. § 271(e)(2)(A), Mylan has infringed at least one claim of the '486 patent, including for example claims 1–29, by submitting, or causing to be submitted to the FDA,

ANDA No. 212572 seeking approval to manufacture, use, import, offer to sell and/or sell Mylan's ANDA Product before the expiration date of the '486 patent.

106. 35 U.S.C. § 271(e)(2)(A) provides that it is an act of infringement to submit an ANDA for the purpose of obtaining FDA approval to engage in commercial sales of a drug to be used in a manner claimed in a patent prior to the expiration of that patent. As explained above, on information and belief, Mylan has filed an ANDA seeking FDA approval to sell Mylan's ANDA Product, and, subject to FDA approval, intends to launch its ANDA Product on or about July 1, 2026, which is prior to the expiration of the '486 patent. *See supra* ¶¶ 22, 44, 50. Furthermore, on information and belief, Mylan is seeking FDA approval for one or more uses of its ANDA Product that are claimed in the '486 patent, as explained above. *See supra* ¶¶ 86-103.

107. On information and belief, Mylan has knowledge of the '486 patent, at least because of the notice Pharmacosmos provided on or about March 11, 2026 and which Mylan received on March 20, 2026.

108. On information and belief, if the FDA approves ANDA No. 212572, healthcare professionals will directly infringe under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least one claim of the '486 patent by the use of Mylan's ANDA Product according to Mylan's provided instructions and/or label.

109. On information and belief, Mylan knows and intends that healthcare professionals will use Mylan's ANDA Product according to Mylan's provided instructions and/or label and knows or is willfully blind that healthcare professionals will do so in an infringing manner. Mylan will therefore induce infringement of one or more claims of the '486 patent with the requisite intent under 35 U.S.C. § 271(b).

110.   Upon information and belief, upon approval, Mylan will take active steps to encourage the use of Mylan's ANDA Product by healthcare professionals with knowledge or willful blindness that it will be used by healthcare professionals in a manner that infringes at least one claim of the '486 patent for the benefit of Mylan.  Thus, upon information and belief, Mylan will induce infringement of at least one claim of the '486 patent with the requisite intent under 35 U.S.C. § 271(b).

111.   If Mylan's marketing and sale of Mylan's ANDA Product prior to the expiration of the '486 patent is not enjoined, Pharmacosmos will suffer harm from the unauthorized use of the inventions claimed in the Asserted Patents.

## ATTORNEYS' FEES

112.   Pharmacosmos is entitled to recover reasonable and necessary attorneys' fees under 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Pharmacosmos hereby demands trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Pharmacosmos prays for a judgment in its favor and against Mylan and respectfully requests the following relief:

A.   A declaratory judgment that Mylan will induce infringement of the '934 patent under 35 U.S.C. § 271(b);

B.   A judgment that Mylan has infringed the '934 patent under 35 U.S.C. § 271(e) by submitting ANDA No. 212572 and seeking FDA approval to make, sell, offer for sale, and/or import into the United States Mylan's ANDA Product before the expiration of the '934 patent;

41

C. A declaratory judgment that Mylan will induce infringement of the '486 patent under 35 U.S.C. § 271(b);

D. A judgment that Mylan has infringed the '486 patent under 35 U.S.C. § 271(e) by submitting ANDA No. 212572 and seeking FDA approval to make, sell, offer for sale, and/or import into the United States Mylan's ANDA Product before the expiration of the '486 patent;

E. An order preliminarily and/or permanently enjoining Mylan and all persons in active concert or participation with Mylan or acting on its behalf from infringing the '934 and '486 patents;

F. An order enjoining the FDA from approving Mylan's ANDA No. 212572 before the expiration of the '934 and '486 patents, or, if approved before a determination of infringement, revoking approval for Mylan's ANDA No. 212572 until the expiration of the '934 and '486 patents;

G. An award of damages adequate to compensate Pharmacosmos for Mylan's infringement of the '934 and '486 patents prior to their expiration, including Pharmacosmos's lost profits and in no event less than a reasonable royalty, together with pre-judgment interest and costs;

H. An accounting for any infringing sales not presented at trial and an award by the Court of additional damages for any such infringing sales;

I. An award of all other damages permitted by 35 U.S.C. § 284;

J. An award of attorneys' fees in this action as an exceptional case pursuant to 35 U.S.C. § 285; and

K. Such further and other relief in favor of Pharmacosmos and against Mylan as this Court may deem just and proper.

Dated: May 1, 2026

Respectfully submitted,

/s/ *Jenny Chung Quraishi*

Matthew E. Beck
Jenny Chung Quraishi
Jeanelly Nuñez
**CHIESA SHAHINIAN & GIANTOMASI PC**
105 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 325-1500
mbeck@csglaw.com
jquraishi@csglaw.com
jnunez@csglaw.com


Of Counsel:

Jeffrey J. Oelke
Ryan P. Johnson
Vanessa Park-Thompson
**FENWICK & WEST LLP**
902 Broadway, 18th Floor
New York, NY  10010-6035
(212) 430-2600
joelke@fenwick.com
ryan.johnson@fenwick.com
vpark-thompson@fenwick.com

Jonathan G. Tamimi
**FENWICK & WEST LLP**
401 Union St., 5th Floor
Seattle, WA 98101
(206) 389-4510
jtamimi@fenwick.com

*Counsel for Plaintiffs*
*Pharmacosmos Holding A/S, Pharmacosmos*
*A/S, and Pharmacosmos Therapeutics Inc.*

43

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that United States Patent Nos. 12,295,934 (the "'934 patent") and 12,303,486 (the "'486 patent") are currently the subject of proceedings before this Court in *Pharmacosmos Holding A/S et al. v. Daiichi Sankyo, Inc. et al.*, 25-cv-15857 (MEF) (JSA). The Defendant in this matter is not involved in that case.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ *Jenny Chung Quraishi*

Matthew E. Beck
Jenny Chung Quraishi
Jeanelly Nuñez
**CHIESA SHAHINIAN & GIANTOMASI PC**
105 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 325-1500
mbeck@csglaw.com
jquraishi@csglaw.com
jnunez@csglaw.com


Of Counsel:

Jeffrey J. Oelke
Ryan P. Johnson
Vanessa Park-Thompson
**FENWICK & WEST LLP**
902 Broadway, 18th Floor
New York, NY  10010-6035
(212) 430-2600
joelke@fenwick.com
ryan.johnson@fenwick.com
vpark-thompson@fenwick.com

Jonathan G. Tamimi
**FENWICK & WEST LLP**
401 Union St., 5th Floor
Seattle, WA 98101
(206) 913-4325
jtamimi@fenwick.com

*Counsel for Plaintiffs Pharmacosmos Holding
A/S, Pharmacosmos A/S, and Pharmacosmos
Therapeutics Inc.*

45